[No. 3068.]

MOISES MARTINEZ *v.* THE STATE.

1. THEFT—STANDARD OF VALUE—CHARGE OF THE COURT.—Theft of ordinary property is a felony or misdemeanor according to whether the article stolen was worth as much as or more than twenty dollars, or less than that sum, and when that value is an issue to be determined in the trial, so as to ascertain the grade of the offense, it is the duty of the court to charge the jury upon the standard of value; which is the market value of the article if it have such a value, and if not, the amount it would cost to replace it. The requested charge in this case, though not properly embodying the law, was sufficient to call the attention of the trial court to the omission, and the failure to charge upon the standard of value was error.

2. SAME—EVIDENCE—PROOF OF VALUE.—Any evidence from which the jury can infer the value of a stolen chattel is evidence; as, for instance, what the owner testifies of its value to him, the opinions of witnesses acquainted with the value of like property, what such property has brought at actual sales, etc. See the statement of the case for evidence objected to by the defendant, and *held* admissible under this rule.

3. SAME—CASE STATED.—In a prosecution for the theft of a saddle, but one witness located the saddle in the possession of the defendant, and that witness was the party in whose possession it was found. Having testified that he purchased the saddle from the defendant, the defendant, for the purpose of laying a predicate to impeach the witness by showing his complicity in the theft, asked the witness on cross-examination the following question: "Did your wife, in your presence, at your house, and in the presence of Juan Montez and F. Gallan, on the tenth day of December, 1883, deny that the saddle was in your house, and deny all knowledge of said saddle?" *Held*, that for the purpose it was asked, the question was competent, and the exclusion of the answer thereto was error. See the opinion *in extenso* on the question.

4. SAME—FINDING OF LOST PROPERTY—INTENT—CHARGE OF THE COURT.—Property that is lost, equally with other property, may be the subject of theft. To constitute theft of lost property, however, the fraudulent intent, which is the gist of the offense, must exist in the mind of the taker at the time of the taking; and in case of lost property, the time of the taking is the time of the finding of the property. If the fraudulent intent did not exist at the time of the taking, no subsequent fraudulent intent in relation to the property will constitute theft. Note, in the opinion, a summary of evidence which demanded of the trial court a charge embodying the principle announced. Note also a charge formulated by this court as responsive to this issue.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

The indictment charged the appellant with theft of a saddle, bridle and saddle blanket, of the aggregate value of thirty dollars, the property of Juan Montez, in Bexar county, Texas, on the eighth day of December, 1883. A verdict of guilty was returned against the appellant, and his punishment was assessed at a term of two years in the penitentiary.

Juan Montez was the first witness introduced by the State. He testified that, on the eighth day of December, 1883, his son, Jose Montez, left his, witness's, house near the mission, nine miles below San Antonio, to go to the city. When Jose reached the suburbs of the city, he was thrown from the horse, and the horse, with saddle, bridle and saddle blanket, made its escape from Jose. As soon as the witness was apprised of this fact, he started out to hunt for the horse, saddle, bridle and blanket. When he reached the Goliad road he saw two gentlemen traveling that road, going in the direction of San Antonio. From them he learned that they had met a man riding a paint horse, and leading a horse answering the description of witness's horse. The man, they said, was going eastward from San Antonio. Witness continued his search, and after a time found his horse on the range, but the bridle, saddle and blanket were gone. Witness subsequently learned that there was a paint horse on the ranch of Alejos Perez, which answered the description of the horse given him by the two gentlemen he met on the Goliad road. Witness went to the ranch of Mr. Perez, and there learned that the defendant had taken up a horse with a new saddle and bridle on, and had taken them to San Antonio. Witness had the parties at the ranch to describe the horse and saddle, and became satisfied that the saddle was the one he was searching for. At Perez's ranch witness talked to Trinidad Cortinez, and from him learned of the defendant's having had the horse, saddle and bridle. Witness received this information from Cortinez on the evening of December 10, 1883. Next day witness went to San Antonio, distant from Perez's ranch fifteen miles, and began a search for the saddle in the city.

Preliminary to his search he secured the professional services of police officer Pancho Galan. They finally learned that a party had taken a saddle to pawn to the pawn shop of Don Carlos Guerguin, on the night of December 9, 1883. The saddle so

pawned to Guerguin was a full rigged new saddle, and answered the description of the one the witness had taken from him. On the night of December 9, 1883, the witness and Galan went to the house of Crecencio Bueno, across the San Pedro creek, and there found the saddle. This saddle was the property of the witness, and was taken without his knowledge or consent. Witness did not know the actual value of the saddle. It was quite new, having been used but two or three times in riding from witness's ranch to San Antonio and back, a distance of nine miles. The saddle tree was a present to the witness, and was worth at least four or five dollars. The witness had paid twenty dollars to have it rigged. The saddle exhibited on this trial was the one lost by witness and recovered from Crecencio Bueno. This all occurred in Bexar county, Texas.

Cross-examined, the witness stated that the saddle was his property, but was lost by his son Jose. It was worth twenty-five dollars. Witness did not know who got it. He did not know the defendant. He learned, in following up the saddle, that a man named Garcia took the saddle to Guerguin's pawn shop, to pawn it. Pancho Galan was with the witness when the saddle was recovered at the house of Crecencio Bueno. The witness did not know from whom Crecencio Bueno got the saddle, except from his statement. Witness did not know, except from hearsay, that the defendant ever had the saddle in his possession at all. So far as the witness knew, the defendant may have sold the saddle for Quireno Garcia. Witness would not swear that the defendant stole his saddle; he did not know whether he did or not.

J. S. Ramsey testified, for the State, that he was the proprietor of a saddle and harness establishment on Main plaza, in the city of San Antonio. He had been engaged in that business for the past fifteen years, and was a judge of the quality and value of saddles. He had examined the saddle involved in this proceeding. That saddle has been used a little, but not enough to greatly depreciate its value. In the opinion of the witness, that saddle is worth at least twenty-five dollars.

Cross-examined, the witness testified that he did not deal in second hand saddles, and would not keep them in stock. This saddle showed to have been used somewhat, and witness would not buy it. It is a second hand saddle, but well worth twenty dollars, though the witness would not give that price for it to put in stock. If, however, he wanted to buy a saddle for his in-

dividual use, witness would pay twenty dollars for it, and esteem the price cheap.

On re-direct examination, witness said that the saddle in the hands of the original purchaser, after being ridden back and forth over a distance of nine or ten miles as often as three or four times, would, in the condition of this saddle, be worth to the original owner as much as twenty-five dollars. It would deteriorate intrinsically by such use, but little, if at all.

Francisco Galan (spoken of as Pancho Galan by the prosecuting witness,) was next called to the stand by the State. He testified that he was, and for fifteen years past had been, on the police force of the city of San Antonio. He knew Juan Montez. On or about December 11, 1883, Montez applied to him for assistance in searching for a saddle, bridle and blanket he had lost. Witness went with Montez, and on that night they found and recovered the saddle from the house of Crecencio Bueno, west of the San Pedro creek. The saddle exhibited on this trial was the saddle found by Montez and witness at Bueno's house, and claimed by Montez as his.

Cross-examined, witness stated that he at no time saw the defendant in possession of that saddle. The witness did not know the value of the saddle, but would think it worth from twelve to fourteen dollars. It was probably worth a little more before it was used.

Re-direct, the witness stated that he was a policeman, and not a dealer in saddles, and was not posted as to the value of saddles. He named the value stated merely as a matter of individual opinion, and not from a knowledge of values. In his opinion the saddle was worth, when new, fifteen or sixteen dollars, and was now worth twelve or fourteen.

Crecencio Bueno was the next witness for the State. He testified that he recognized the saddle exhibited on this trial as the one he purchased from the defendant, and which was afterwards reclaimed from him by Montez and Galan. Defendant brought that saddle to the witness's house, and sold it to him on the night of December 10, 1883.

On cross-examination, the witness stated that he paid the defendant ten dollars for the saddle, which was all that he thought he could afford to pay for it. Defendant did not tell where he got the saddle, nor did the witness know.

Trinidad Cortinez was the last witness introduced by the State. He testified that in December, 1883, he lived on the

ranch of Alejos Perez.  He saw Juan Montez at that ranch du·
ring that month.   Montez was looking for a horse that had es·
caped from his son, with saddle, bridle and blanket.  Montez
described the horse and saddle, and witness told him that the
defendant had brought such a horse and saddle to the ranch,
and had taken them to San Antonio, as he said, to hunt an
owner for them.   Witness could not recall the day of the month
on which this happened, but it was sometime near the first.
Witness did not know that he could identify the saddle, as he
looked at it from some little distance.   He knew, however, that
it was a new-looking full rigged saddle.   Montez, on getting
this information from witness, started off toward San Antonio
to look for the saddle.  This was two or three days after defend-
ant started to San Antonio with the horse and saddle.   Perez's
ranch is on the Goliad road, some twelve or fifteen miles from
San Antonio.

On cross-examination, the witness declined to swear positively
that the saddle shown him was the same that was brought to
Perez's ranch by the defendant.   He could say, however, that it
looked very much like it.   When defendant left Perez's ranch
he said that he was going to hunt the owner of the horse and
saddle and deliver up the property. Witness did not know what
he eventually did with the horse and saddle.

William Roach testified, for the defense, that he was a saddler
and a judge of the value of saddles.   The saddle shown the wit-
ness was worth, new in the shop, twenty-five or twenty-six dol-
lars.   In its present condition, the saddle, having been used to
some extent, was not worth so much by six or eight dollars.   It
could not now be sold, as a second hand saddle, for more than
eighteen or twenty dollars.

Cross-examined, the witness testified that the saddle, because
of such use as it has had, is not intrinsically depreciated in value
to the original owner.   To him, it would be worth quite as much
as when he got it new.   Articles, when once used by one per-
son, are less desirable for sale or market, and, because of such
use, they lose much more in market than in intrinsic value.
Intrinsically, this saddle is worth quite as much as it ever was.
It is not worth so much in the market.

Carlos Guerguin was the defendant's next witness.  He testi-
fied that he had seen the saddle in evidence before.  A man who
gave his name as Quireno Garcia brought it to witness's pawn
shop one night, and wanted to pawn it.  Garcia said that he

---

---

brought the saddle from Kansas.   Garcia was not the defend-
ant.   Witness would willingly pay sixteen dollars for the saddle,
but no more.

Witness stated, on his cross-examination, that, were he to buy
the saddle, he would buy it on speculation.   Witness, in men-
tioning the price he would pay for the saddle, mentioned the
speculation price.   The saddle, in the opinion of the witness,
was really worth more than sixteen dollars.   It was worth
twenty or twenty-five dollars.   In buying articles, the witness,
in his business, would pay but two-thirds of the actual value,
and this was the rule applied by the witness in estimating the
value of the saddle in his examination in chief.   It was on the
night of the ninth or tenth of December, 1883, that Quireno Gar-
cia brought the saddle to the witness to pawn.   Witness exam-
ined the saddle closely, for one reason, because it was a much
better article than was usually brought by the class of men to
whom Garcia apparently belonged; and, for another reason, be-
cause it bore the stamp of a San Antonio manufacturer, whereas
Garcia said that it was made in Kansas.

The ruling embodied in the second head note of this report re-
fers to the testimony of J. S. Ramsey, the second witness for
the State.

The motion for new trial raised the questions discussed in the
opinion, and criticised the charge as given by the court.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   1.   There was some conflict in the testi-
mony as to the value of the saddle alleged to have been stolen,
and there was, also, a question raised on the trial as to the
proper standard of value.   Evidence was admitted, over objec-
tion made by defendant, of the value of the saddle to the owner
of it.   In the charge of the court, the jury were not instructed
as to any standard by which to determine the question of value.
Upon this subject, the defendant requested the following spe-
cial instruction, viz.:   "The value of property is not to be based
on what the owner may value it, but is to be fixed by its in-
trinsic value."   This was refused.

It was important in this case for the jury to ascertain, cor-
rectly, the value of the saddle, because upon that value de-

pended the grade of the offense and its punishment. If worth twenty dollars, or more, the offense was a felony; if less than that sum, it was only a misdemeanor. There was testimony both ways upon this question, some of the witnesses testifying that the saddle was worth more, and some that it was worth less than twenty dollars. Under these circumstances, we think the court should have instructed the jury as to the proper standard by which to arrive at the value of the property.

What is this proper standard in cases of theft? Mr. Bishop says: "The word 'value' is, like most others, even in legal language, slightly variable in meaning; but, ordinarily, for the purposes of this inquiry, it signifies the sum for which the like goods are, at the time, commonly bought and sold in the market. If a thing has a value to the owner, though to no one else, to steal it is larceny, its 'value, as to the rest of the world,' being, in the language of Grose, Judge, 'immaterial.' Still, in determining the grade of the offense, the value merely to the owner is not the standard for the jury. Yet, a thing not bought and sold in the market may have a value, as when it is an article fitted for a specific use of the owners, and worthless for every other purpose. To attempt to test it by the open market, where it is never offered for sale, and is never bought, would be absurd. In reason, the cost of replacing it would ordinarily be the standard of its value." (2 Bish. Crim. Prac., sec. 751.)

Adopting the foregoing as the correct rule, the proper standard of value in this case was the market value of the saddle, if there was any market for such property. If it had no market value, then the amount that it would cost to replace it would be the standard of its worth. While the special instruction requested by defendant upon this subject did not correctly prescribe the standard of value, it was sufficient to call the attention of the court to that issue in the case, and to the fact that the law upon such issue had been omitted in the court's charge. It was error, in our opinion, to fail to instruct the jury as to the proper standard of value.

2. As to the mode of proving value in trials for theft, Mr. Bishop says: "Any evidence from which the jury can infer the value of a stolen chattel is competent; as what the owner testifies of its value to him, the opinions of witnesses acquainted with the value of like property, what such property has brought at actual sales, etc." (2 Bish. Crim. Prac., sec. 751.) We are of the opinion that, under the rule above quoted, the testimony

objected to by defendant to prove the value of the saddle was admissible.

3. The saddle stolen was found in the possession of one Crecencio Bueno, who testified that he bought it from the defendant. No other witness proved that defendant ever had possession of that identical saddle. On cross-examination of this witness, the defendant's counsel asked him the following question: "Did your wife, in your presence, and at your house, and in the presence of Juan Montez and F. Galan, on the tenth day of December, 1883, deny that the saddle was in your house, and deny all knowledge of said saddle?" This question was propounded for the purpose of laying a predicate to impeach this witness, by showing his complicity in the theft of the saddle. It was objected to by the district attorney, and the court sustained the objection. In the bill of exceptions to this ruling, the learned judge gives his reasons for the ruling, as follows: "Because the question asked seeks to elicit the statements, if any were made, of a third party, who is the wife of the witness; because it seeks to elicit a statement of a third party at the time the saddle was discovered, when the State sought to elicit everything that was said at that time and place, in its examination of this witness and F. Galan in chief, and which was excluded by the court, on objection of counsel for defendant; because the question relates to what a third party said, if anything, in which the defendant nor the witness had any participation; and because said testimony is inadmissible and irrelevant, and does not inform the jury of anything material in connection with the cause."

We differ with the learned judge upon this question; and do not think that the reasons assigned for his ruling are sound. For the purpose for which the question was asked, we think it was legitimate. If the witness was present, and heard the persons who were in search of the saddle inquire for it and describe it, and heard his wife assert to them that it was not there, and that she had no knowledge of it, and ne remained silent, knowing at the same time that the saddle was in his house, and in his possession, it seems to us that these facts would bear strongly against the credibility of this witness, and might reasonably be calculated to influence the minds of the jury in weighing his testimony. To say the least of it, it would be a circumstance tending to cast a suspicion upon the witness that he was an accomplice in the theft of the saddle. The question was not ob-

I

jectionable because it sought to elicit statements made by the wife of the witness. It was not a violation of the rule that the husband or the wife shall not be allowed to testify against each other, for the witness was not upon trial for any offense. Nor can we perceive why the question should be held improper because the State had sought to prove all that was said on the occasion of the discovery of the saddle, but had not been permitted to do so, upon objections interposed by the defendant. The State was not entitled to prove what was said on that occasion, the defendant not being present, and such testimony was properly rejected. But, because the defendant did not choose to allow, without objection, illegal testimony to be introduced against him, is he to be denied the right of introducing that which is legal, and which he conceives to be to his advantage? Clearly not, we think.

4. There is another question in this case of more importance than those we have discussed. Conceding that the defendant took the saddle, did such taking, under the facts of this case, constitute theft? and did the court charge all the law applicable to the issues raised by the evidence? That the owner of the saddle had lost it was proved beyond a question. It was, then, lost property, but was, nevertheless, the subject of theft. To constitute theft, however, the fraudulent intent, which is the gist of this offense, must exist in the mind of the taker at the very time of the taking; and, in the case of lost property, the time of the *taking* is the time of the *finding* of the property. If the fraudulent intent did not exist at the time of the taking, no subsequent fraudulent intent in relation to the property will constitute theft. (*Robinson* v. *The State*, 11 Texas Ct. App., 403.)

In this case it was proved that on the day the saddle was lost, the defendant was seen in possession of such a saddle, and said that he was going to the city of San Antonio to search for the owner of it in order to deliver it to the owner. He did not then pretend that the saddle belonged to him, but admitted that he had found it, and intended to search for the owner of it. There is no evidence which shows that, even if the defendant took the saddle, he at the time intended to deprive the owner of the value of it, and to appropriate it to his own use or benefit. On the contrary, his own statements above alluded to, which were proved by the State, show that *after* he had taken the property, his intention with regard to it was an honest one; he intended

to restore it to the owner, if such owner could be found.   Upon this state of facts we think it was the duty of the trial court to instruct the jury clearly and specifically upon the issues as to the intent of the defendant at the time he took the property, if he did take it.

The charge of the court did not explain this issue to the jury any farther than to give the general definition of theft.   Defendant requested the following special instruction, which the court refused to give, viz:   "If the property came into the possession of the defendant by lawful means, the subsequent appropriation of it is not theft, and you will acquit the defendant, unless it was obtained by false pretext, or with intent to deprive the owner of the value thereof and appropriate the property to the use and benefit of the person taking."   This charge would have been more directly applicable to the evidence if it had read:   "If you believe from the evidence that the property was lost, and that the defendant found it, he cannot be convicted of the theft of it unless you believe from the evidence that at the time he found it he fraudulently took it with the intent at that time to deprive the owner of the value of it, and to appropriate it to his own use or benefit.   No fraudulent intent in the mind of the defendant in relation to the property, which was formed after he had taken the property, will authorize his conviction of the theft of such property."

We think a charge in substance such as we have suggested was demanded by the evidence in this case, and that the court erred in omitting to give such an one.   The charge of the court was excepted to by the defendant, because it failed to give the jury all the law of the case, and for other reasons.   We think the court erred in not instructing the jury upon the question of intent as above indicated.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered May 3, 1884.